# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI SOUTHERN DIVISION

UNITED STATES OF AMERICA,　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　Plaintiff,　　)
　　　　　　　　　　　　　　　　　)
　　　vs.　　　　　　　　　　　　　)　　　　No. 09-03024-01-CR-S-RED
　　　　　　　　　　　　　　　　　)
DANNY L. THORNTON,　　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　Defendant.　　)


## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Defendant filed a Motion to Suppress Statements, in which he asserts that statements made on March 20, 2009, should be suppressed. [Doc. # 66]. The United States filed its response, [Doc. # 72], and defendant filed a reply. [Doc. # 78]. The matter was set for an evidentiary hearing, which was held before the undersigned on March 5, 2010. The defendant was present with counsel, Tracey Martin, and the United States was represented by James J. Kelleher, Assistant United States Attorney.

Defendant moves to suppress the statements he made on the grounds that he did not knowingly and voluntarily waive his Miranda rights, and that his statements were not voluntary under the Fifth Amendment. Specifically, he asserts that he was held in custody for approximately twenty hours, and that his alleged waiver of rights was not made voluntarily. Additionally, he contends that his will was overborne and his capacity for self-determination was compromised by the fact of the nearly twenty-hour hold; the coercive conduct and false promises from Officer

McCrary; his concern over not being able to afford an attorney; and that no effort was made to provide him with an attorney or advise him that his family had called and offered to provide an attorney.

The government contends that defendant's invocation of his right to remain silent was "scrupulously honored" under the law, and that subsequent questioning is permissible if a significant amount of time has passed and new <u>Miranda</u> warnings have been given. Additionally, it is asserted that the mere fact of defendant being held in custody nearly twenty hours prior to confessing does not render his waiver of his <u>Miranda</u> rights involuntary. Further, the government contends that defendant did not clearly invoke his right to counsel. Additionally, it is asserted that Officer McCrary adamantly denies making any promise to defendant; that defendant knew that federal authorities were involved in the investigation from the beginning; and that defendant does not reference any such agreement in his written statements or the typewritten question and answer record of the interview.

In his reply, defendant reiterates that his statements were not voluntary based on the totality of the circumstances. He contends that the fact that he signed the "Notification of Rights" is not indicative that his statements were voluntary because he had no prior experience with law enforcement, and he relied on the promise of lenient treatment from Officer McCrary.

The first witness for the government was Jim McCrary, who is an investigator for the Cedar County Sheriff's Department. On March 18, 2009, he was advised that a fire had been set at 600 West Street, Stockton, Missouri, on property owned by defendant. The officer was the lead investigator. There were other agencies involved in the investigation, including the State Fire Marshal's Office and the Bureau of Alcohol, Tobacco, Firearms and Explosives ["ATF"]. On that

day, members of ATF came to Cedar County to assist with the investigation. Defendant arrived at the scene and spoke with Officer McCrary and the Fire Marshal's Office. Initially, he was not a suspect. Defendant told them several different things about the origin of the fire. For example, he said that it might have been a hate crime, or that he'd had problems with the bank and suggested that might have been why the fire was set. During the investigation, the officers found some items from Lowe's in Springfield, which suggested that arson might be a possibility. The officers determined that Dina Larson might have been involved in setting the fire. They were able to secure a search warrant for the residence of Dina and Rick Larson. Ultimately, the individuals charged were Ms. Larson, Jacob Smith, who is Ms. Larson's son, and defendant. Ms. Larson was equipped with a recording device to assist in the investigation of defendant. After she met with defendant on March 19, they were able to determine that he was definitely involved. Defendant was arrested about 2:00 p.m. on that day. Officer McCrary became directly involved in the case after defendant was arrested and brought to the sheriff's department. Officer McCrary asked him if he wanted to talk to the authorities. He had already been advised of his <u>Miranda</u> rights, and he said he did not want to talk. He was turned over, at that point, to other officers for processing. There was no other discussion, other than defendant saying that he did not want to talk. The next day, the officer went back to the jail and spoke to defendant, who asked him if he was going to be released. Officer McCrary told him, "no," and that he was probably going to be charged with arson. [Tr. 7]. The officer asked defendant if he wanted to talk now, and he said "yes." [<u>Id</u>.]. He again read him his rights, and defendant signed the notification and waiver of rights form. After he executed his waiver of rights, the officer asked him to tell him what his involvement was in the fire. Defendant said that Dina Larson had brought up the topic of arson. He did not think she was serious, but it kept coming up.

3

Eventually, he said that he realized she was serious. The officer believed that it was after he had made a written statement that defendant brought up the topic of federal prosecution. Defendant was worried about being charged federally; he stated that he did not want to go to federal prison, and that he wanted to be charged by the state. The officer told him he couldn't make promises like that, but he would talk to the state prosecutor. Defendant seemed to understand that the officer could not make such promises. They took a break, and Officer McCrary went upstairs and talked to the state prosecutor, Michael Ash. He believed that Agent Dan Fridley of ATF was also there. When he came back down, the officer made it clear to defendant that the local prosecutor and federal authorities had more questions that they wanted him to ask. Towards the end of the interview, the officer typed up a typewritten question and answer record of the interview, which included his questions and the answers defendant had provided. Defendant never requested an attorney, and the officer was never aware of an attorney trying to reach him. Defendant was never threatened, and never promised anything in exchange for making his statement. Officer McCrary testified that he told defendant "that I would put in a good word for him with my prosecutor, but that I didn't – could not guarantee what would happen after that." [Tr. 11].

On cross examination, Officer McCrary testified that he knew defendant before the investigation. He frequented a pizza parlor and video store that defendant owned. He agreed that defendant initially refused to make a statement when he was in the booking room. The officer testified that the booking room was not set up as a cell, but it has been used to hold people, and in fact, it was used to hold defendant. On March 20, 2009, the officer saw defendant at 10:00 a.m. in the booking room. He did not know if he had been held in that room the whole time. The officer acknowledged that the booking room was locked when he went in. In his supplemental report, the

officer stated that he saw defendant in the booking room at 10:00 a.m.; he advised him of his rights at 10:13; and defendant signed the waiver of rights form at 10:15. After that, the officer took him to the deputy's office next door. During the 13 minutes before defendant signed the waiver, the officer testified that he did not remember what they discussed. He didn't remember if this was when they talked about the difference between federal and state charges. He acknowledged that there were bookshelves in the deputy's office, and he pulled one of the books out regarding state charges. He stated that he and defendant looked at the book on state statutes. He didn't remember if he told him he was likely to get probation if there were state charges brought. He did know they discussed the difference between state and federal charges. The officer denied that he promised defendant that federal charges would not be brought if he would cooperate. Defendant told him several times how he could not go to federal prison. Defendant did not tell him that he could not afford an attorney. Regarding the fact that defendant's interview was not recorded, that was because he personally was not equipped to record defendant's statement. He acknowledged that the co-defendants' statements were recorded. Regarding typing his report, he stated that he typed specific questions and wrote down what defendant said in his words. The officer denied that he paraphrased anything. He acknowledged that defendant was "pretty forthcoming after the initial written statement." [Tr. 19]. He thought the interview lasted about an hour. The officer acknowledged, however, that the Question and Answer Form indicated that the interview ended at 12:38 p.m., which was over two hours after it started. After the officer spoke with Michael Ash, he denied telling defendant that Mr. Ash said that he would definitely file state charges. The form was signed at 1:20 p.m. It was noted that defendant initialed his answers on the statement.

Defendant testified on his own behalf. He was taken into custody about 11:00 a.m. on March

19, and taken to the Cedar County Jail. The officers asked if he wanted to make a statement, and he said, "No, I do not." [Tr. 26]. No one came to see him the rest of the day to ask him to make a statement. He was placed in the booking room, which contained a chair and a homemade table. He was never moved until after he made the statement the next day. He was cold in the booking room because the radiator was broken, as was one window. They gave him a mat and blanket to sleep on the floor, but he could not sleep. He was awakened all night; at one point they handcuffed him to a bannister while they booked someone else. If he had to use the restroom, he had to push an intercom button and someone would take him. On the morning of March 20, he saw Officer McCrary in the booking room. The officer asked if he wanted to talk to him yet. Defendant "asked him what was going on because I had been there a long time and I was – I wanted to know what was going on and when I was getting released." [Tr. 28]. They went to McCrary's office. When he first got in there, the officer told him there was a difference between state and federal charges, which defendant did not know because he hadn't been in trouble before. The officer pulled a book off the shelf in his office, and read him the difference between state and federal charges. He recalled that the state charges carried up to seven years, and the federal up to 20 years. Defendant testified that Officer McCrary told him that if he was charged by the state, he "would probably get off with probation and never serve any time." [Tr. 29]. If he was charged by the federal government, the officer said it would be a lot more time and it would be prison time. He did not understand that he could be charged by either state or federal authorities. Defendant testified that he told the officer that he did not want to go to federal prison. The extent of his involvement with law enforcement to this point was when he was pulled over about four years previously. He had never spent any time in jail, and had never been interrogated before. Defendant stated that he signed the waiver of rights form

after he and Officer McCrary had discussed the difference between state and federal charges.  At the time he signed the waiver form, the officer told him if he "would work with him and he felt I was working with him, that he would talk to Michael Ash to get me on state charges." [Tr. 30]. Defendant testified that he would not have made the written statement if the officer hadn't had the discussion about state and federal charges with him.  During the course of the interrogation, Officer McCrary told him three or four times that he didn't think defendant was working with him and didn't think he was cooperating. Defendant testified that he asked a question about a statement that the officer attributed to him, which he thought should have been longer.  Officer McCrary told him that when he talked to the prosecutor, he would give the full answer that defendant had provided.  The officer then told him that he had talked to Michael Ash, telling the prosecutor that he felt that defendant had worked with him. The officer told defendant that Mr. Ash was going file state charges.  In April, he was charged by the state.  He was surprised that ATF contacted him later in April, and that he was charged federally.  It was defendant's testimony that he and Officer McCrary were personally acquainted.  The officer was in defendant's pizza place about twice a week; he was in the video store about once a week.  Defendant had known the officer for about 10 years.  At the time of the interview, Officer McCrary kept telling him that he could trust him, and he did.  When the officer read him his rights, he told him he couldn't afford an attorney.  The officer continued to go on with his questions, and defendant allowed this to continue out of "ignorance."  [Tr. 33]. Defendant testified that he allowed the interview to continue after he had signed the waiver form because of the promises Officer McCrary had made to him.

On cross examination, defendant acknowledged that jail staff brought him food.  He wasn't comfortable, but he admitted that he did have access to a bathroom.  He reiterated that he was

apprised of his rights upon arrest, and then refused to make a statement at the jail.  When Officer

McCrary came into the booking room to talk to him, defendant stated that he asked him what was

going on, and the officer told him he didn't know what was going on or when he would get out, "but

it would be a lot quicker if I spoke with him and worked with him." [Tr. 35].   According to

defendant's testimony, the officer brought up the difference between federal and state charges.  He

pulled a big blue book off a book shelf in the office, and he asked defendant if he knew the

difference.  Defendant told him that he did not.  The officer told him the range of punishment for

state and federal charges. He doesn't remember a minimum sentence being mentioned for federal

charges.  It was his testimony that Officer McCrary made the promise that he would be charged by

the state before he read defendant his Miranda rights.  He admitted that he executed the waiver of

rights form, and that the form has language  that "No promise or threats have been made to me and

no pressure or coercion of any kind has been used against me." [Tr. 38].  He admitted that he signed

the bottom of the form, and that he voluntarily made a written statement.  When Officer McCrary

left the room, he  told him he was going to speak to Michael Ash, but didn't mention ATF Agent

Fridley or anyone from ATF.  Defendant testified that he knew that ATF had been actively involved

in the investigation, but he didn't know they were part of the federal government.   Defendant

testified specifically that Officer McCrary told him that if he "would work with him and answer his

questions and help him, that he would go to the prosecuting attorney, Michael Ash, and talk to him

and let him know what was going on and he would probably get me - - he would get me state

charges.  And that would mean I would serve no time and I would get off with probation." [Tr. 39].

On redirect examination, defendant testified that he understood from Officer  McCrary that

he would serve no time on state charges.  Even though the waiver form indicated that no promise

had been made, he stated that he felt like he had no option regarding signing the form. He testified that he was signing it based on the promise that had been made by Officer McCrary.

Officer McCrary was called back to the stand. He testified that when he talked to defendant, he pulled the Missouri Blue book off the shelf, which contained only Missouri criminal statutes. He was somewhat familiar with the federal arson statutes, but had not previously been involved in a federal arson case. He would not have been able to communicate the difference to defendant, and he did not believe that he told defendant anything about federal sentences. He wasn't aware that probation was somewhat more rare in federal cases, and he therefore could not have communicated that to defendant.

The law is clear that a statement is "is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." Simmons v. Bowersox, 235 F.3d 1124, 1132 (8th Cir. 2001). Voluntariness is measured according to the "totality of the circumstances surrounding the interrogation, including law enforcement officials' conduct and the defendant's capacity to resist any pressure," with specific consideration of "factors such as detention length, the repetitive and prolonged nature of questioning, and the accused's age." Id. at 1132-33. The Eighth Circuit has held that a " 'statement is involuntary when it was extracted by' " such tactics as " 'express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination.' " United States v. LeBrun, 363 F.3d 715 (8th Cir.2004) (en banc). In LeBrun, where the defendant did not receive Miranda warnings, the Eighth Circuit ruled, nevertheless, that a defendant's "confession was not compelled because a defendant's mistaken belief that he could not be prosecuted does not render a confession involuntary." Id. at 725. The court clarified that the

governing test--which it characterized as "a very demanding standard"--is "whether the facts surrounding [the] interview demonstrate that the authorities overbore [the defendant's] will and capacity for self-determination." Id. at 726. Relying substantially on several factors, including the speed with which defendant confessed, that he had a subjective understanding of his Miranda rights, and that he was a "sophisticated individual with legal training," the Court concluded the confession was not involuntary. Id. at 726-27.

In the instant case, it is important to be mindful that defendant had been Mirandized for a second time before he made any statements, according to the credible testimony of the officer. Defendant does not dispute this, although he suggests that the officer first told him about the difference between state and federal charges before he advised him of his rights for the second time. The officer acknowledged that 13 minutes elapsed, and testified that the conversation about state charges could have occurred during that brief period. He adamantly denied, however, that he ever promised defendant that federal charges would not be brought. He convincingly testified, additionally, that he was not that familiar with federal arson cases, and would not have known that probation would be rare in a federal case. Defendant, even in his own testimony, could not articulate that he believed that Officer McCrary absolutely promised him that he would not be charged federally. It must be noted, moreover, that his testimony that while he knew that the federal government was involved in the investigation, he did not think that the office of ATF was a part of the federal government, rings disingenuously.

There is nothing in this case to suggest that defendant is not of at least average intelligence. While he argues that 20 hours in the holding cell impaired his judgment, his testimony did not support that assertion. He admitted that while he was not comfortable, he had

food and access to a restroom, as well as some means to sleep. There is no indication, therefore, that he was deprived of any basic necessities that could have impeded his ability to make rational choices. He was apparently only handcuffed when another individual was being booked through that room. Despite his efforts to the contrary, there is nothing about the period of time nor the conditions to which he was subjected that would cause a reasonable person, under the totality of the circumstances, to believe that defendant was subjected to such oppressive physical and psychological tactics that his will was overborne. There are no factors present in this case that would suggest that defendant's ability to render voluntary and knowledgeable consent was compromised in any manner. It is true that he had not had significant experience with law enforcement. Otherwise, there are no unique characteristics about defendant that would render him unable to act voluntarily in making statements to the officer. There were also no factors regarding the conduct of law enforcement that would invalidate the voluntariness of his consent. While the officer admitted that he knew defendant personally, and even though defendant stated that he trusted the officer, this, in and of itself, does not constitute an overwhelming or oppressive police presence. Only one officer was present; there is no question that defendant was advised of his rights; he knowingly answered questions and even initialed the answers he gave; and he acknowledged on the written form that no promises had been made. The record does not support a finding, moreover, that he unequivocally invoked his right to counsel when and if he mentioned that he might not be able to afford an attorney. The Court believes that the circumstances surrounding defendant's statements raise no inference that they were in any way illegally coerced.

The Court has carefully reviewed the arguments of the parties, the testimony at the

hearing, and relevant case law, and concludes that there is no evidence in the record to support defendant's contention that the agent made a promise that defendant would not be federally prosecuted for arson, such that the promise would have achieved a level of legally cognizable coercion. The record indicates that he signed a waiver of rights form, and spoke voluntarily to the officer. While defendant may have been naive and trusting, there is no indication on the record before the Court that defendant's will was overborne and that he was coerced into making a statement. Therefore, it must be recommended that defendant's Motion to Suppress be denied.

For the foregoing reasons, it is, pursuant to the governing law and in accordance with Local Rule 72.1 of the United States District Court for the Western District of Missouri,

RECOMMENDED that defendant's Motion to Suppress be denied.


/s/ James C. England
JAMES C. ENGLAND
United States Magistrate Judge


Date:  4/8/10